IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

IN RE:                                      )
                                            )
O&S TRUCKING, INC.,                         )    Case No. 12-61003
                                            )
            Debtor.                         )

<u>FINAL ORDER GRANTING IN PART, AND DENYING IN PART, DEBTOR'S
EMERGENCY MOTION FOR AUTHORIZATION TO PAY PREPETITION
CLAIMS OF CRITICAL VENDORS AND CONTRACTORS</u>

Debtor O&S Trucking, Inc. filed this Chapter 11 bankruptcy case on May 30, 2012. The Debtor owns and operates a fleet of trucks, trailers and related equipment for the hauling of freight throughout the country. The day after the filing, on May 31, 2012, the Debtor filed an Emergency Motion for Authorization to Pay Prepetition Claims of Critical Vendors and Contractors (the "Critical Vendors Motion"), and requested an expedited hearing on that Motion. That same day, the Court set the Motion for expedited hearing on June 5, 2012.

Following the June 5, 2012 hearing, I entered an Interim Order granting the Critical Vendors Motion in part, denying it in part, and granting it on an interim basis in part. I also set the Critical Vendors Motion for final hearing, which was held on June 26, 2012. The following constitutes my findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## Background

The Debtor is a mid-sized truckload carrier located in Springfield, Missouri, which owns and operates a fleet of trucks, trailers, and related equipment for the hauling of freight throughout the country. Much of the Debtor's business involves the hauling of refrigerated freight.

According to the Debtor's president and CEO, James E. O'Neal, the Debtor began to experience difficulties in 2008 as a result of the overall economic downturn and some unspecified one-time incidents which caused significant cash losses to the company. In addition, starting in 2010, the Debtor began losing many of its drivers due to communication issues with the Debtor's then-CEO, and many of its trucks were sitting idle. Companies such as the Debtor lose significant amounts of money paying debt service and insurance on trucks which are sitting idle and not generating cash flow. In addition, as fuel prices have increased over the last several years, the Debtor has been unable to entirely pass those increases on to its customers.

Apparently at some point after 2010, Mr. O'Neal, who had apparently stopped working full time for the company for awhile, stepped back in as CEO. By that point, however, the Debtor was rapidly burning through its cash reserves. Mr. O'Neal testified that the Debtor is required to pay its fuel suppliers and drivers on very short terms, whereas its accounts receivable from its customers run on 30 to 45 day terms.

This is, apparently, typical in the trucking industry. In order to improve cash flow, among other things, the Debtor entered into a factoring arrangement with Transportation Alliance Bank. By the spring of 2012, however, the Debtor was coming very close to being unable to stay current with its fuel suppliers, which would have resulted in its being shut off.

Mr. O'Neal's efforts to improve cash flow and profitability culminated in discussions with a competitor, Prime, Inc., one of the largest trucking carriers in the country. These discussions ultimately resulted in a Carrier-Broker Agreement entered between Prime and the Debtor on May 25, 2012, just a few days before the filing of the Chapter 11 bankruptcy case on May 30, 2012.

It is the Debtor's position that this Agreement with Prime is the linchpin of its successful reorganization. In sum, the Debtor says that, due to Prime's size, the arrangement will result in significant reductions in its fuel and maintenance costs, as well as overhead and administrative costs. In addition, much like a factoring agreement, Prime will provide the Debtor with immediate cash based on its receivables, as opposed to the Debtor having to wait 30 to 45 days to collect its own accounts receivable.

On May 31, 2012, the day after it filed the Chapter 11 petition, the Debtor filed an Emergency Motion for Approval and Implementation of Business Relationship

with Prime, Inc., and Request for Expedited Hearing (the "Prime Motion"). It also filed the instant Motion to Pay Critical Vendors. Both motions were heard on an expedited basis on June 5, 2012. Following that hearing, the Court granted the Prime Motion on an interim basis, subject to a final hearing and final Order. The Debtor is currently in the midst of the transition of moving parts of its operations to the Prime "umbrella." Final hearing on the Prime Motion is set for July 12, 2012, and the merits of that Motion and Agreement are not the subject of this Order.

### The Critical Vendors Motion

As to the Critical Vendors Motion, the Debtor asserts the payment of the so-called critical vendors and contractors is absolutely necessary in order to make the transition to Prime and achieve a successful reorganization. Attached to the Critical Vendor Motion was a Critical Vendor List, which identified three categories of creditors whose prepetition claims the Debtor asserts had to be paid immediately in order for any reorganization to be possible. As discussed more fully below, these consisted of (i) independent truck drivers; (ii) contract carriers; and (iii) vendors and suppliers of fuel and mechanical services. The total amount sought to be paid was $943,100.01.

Mercedes-Benz Financial Services USA, LLC d/b/a Daimler Truck Financial; Transportation Alliance Bank; Caterpillar Financial Services Corporation; and the

United States Trustee all voiced objections, either in writing or verbally at one of the hearings.[1]

## Discussion

Nothing in the Bankruptcy Code expressly authorizes the payment of so-called critical vendors, *per se*. Nevertheless, courts have said it is permissible under § 105, § 363, § 364, or § 1107 of the Bankruptcy Code, or under a "doctrine of necessity."[2] It is, indeed, an extraordinary remedy. In deciding whether to approve preferential treatment creditors, I consider the following factors: (1) whether procedural requirements were satisfied; (2) whether the arrangement between the debtor and each critical vendor was negotiated at arms-length; (3) whether approval of borrowing is critical to the future of the debtor's business, *i.e.,* whether the debtor could have obtained the goods and services from this vendor or from another vendor and, if so, at what price and on what terms; (4) whether the transaction confers a benefit on the estate and its creditors and not just on the favored creditors; (5) whether interested parties were represented and, if not, the level of sophistication possessed by unrepresented parties; and (6) the extent to which there was unanimous support or

---

[1] Transportation Alliance Bank's objection was focused primarily on the use of cash collateral to pay the critical vendors, as opposed to the payment of them generally.

[2] *See, e.g., In re Corner Home Care, Inc.*, 438 B.R. 122 (Bankr. W.D. Ky. 2010); *In re Payless Cashways, Inc.*, 268 B.R. 543 (Bankr. W.D. Mo. 2001); *In re Just for Feet, Inc.*, 242 B.R. 821 (D. Del. 1999).

strong disagreement from the creditor body.[3] While the Seventh Circuit questioned whether payment of critical vendors' prepetition claims was allowable at all, it said that if it was allowable, the Debtor would be required to show that the disfavored creditors would be as well off with reorganization as with liquidation and that the supposedly critical vendors would have ceased doing business if old debts were left unpaid while litigation continued.[4]

As to the first factor, relating to procedural requirements, the Motion was filed an May 31 and an expedited hearing was set for June 5. In its Limited Objection, the United States Trustee pointed out that creditors and interested parties had received very short notice of the hearing, that the Debtor had not yet filed schedules, that no unsecured creditors committed had yet been appointed, and that the Critical Vendor Motion sought to pay what appeared to be a significant portion of the Debtor's unsecured prepetition debts, at least based on the information provided about the twenty largest unsecured claims. In addition, the UST pointed to Rule 6003, regarding interim and final relief immediately following the commencement of the case, which provides, in relevant part:

> *Except to the extent that relief is necessary to avoid immediate and irreparable harm*, the court shall not, within 21 days after the filing of

---

[3] *See In re Payless Cashways, Inc.*, 268 B.R. 543 (Bankr. W.D. Mo. 2001).

[4] *In re Kmart Corporation*, 359 F.3d 866, 873 (7th Cir. 2004).

the petition, grant relief regarding the following:

> * * *
>
> (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001 . . . .[5]

Following the June 5 hearing, I found, based on Mr. O'Neal's testimony, that the Debtor would experience immediate and irreparable harm if some of the critical vendors were not immediately paid, as discussed below with regard to each category. That being the case, and since the Interim Order was subject to further hearing and consideration, I find that the procedural requirements were met here.

### The Independent Drivers

One of the categories of vendors on the Critical Vendor List, titled "Transport Services," consists of a number of independent truck drivers with prepetition claims ranging from $1,000 to $4,542. Those claims total $199,592.

These drivers are independent truck drivers, not employees of the Debtor. Apparently, they are paid "settlements" on a weekly basis, based on various factors relating to the loads and routes they have driven for that week. As one might expect in the trucking industry, Mr. O'Neal testified at the June 5 hearing that the drivers are an absolutely vital component of the Debtor's operations. He testified that the drivers

---

[5] Fed. R. Bankr. P. 6003 (emphasis added).

7

have said they will stick with the Debtor for now, but that they generally live paycheck to paycheck. Further, because quality drivers are in very high demand in the industry, if a driver were to pull into a truck stop and the carrier's fuel card was rejected, or if the carrier were to miss even one settlement payment to a driver, that driver could leave and find a job with another carrier the very next day. In essence, as loyal as the Debtor's drivers have been to the Debtor and Mr. O'Neal personally, they can, and will, walk away if they are not paid immediately. And, given the competitive market, quality drivers are not easily replaced. Indeed, Mr. O'Neal testified that one of the contributing factors to the Debtor's downfall was the previous CEO's losing drivers and the trucks sitting idle as a result.

Following Mr. O'Neal's testimony at the June 5 hearing, both the United States Trustee and Mercedes-Benz withdrew their objections as to the drivers. Mercedes-Benz essentially conceded that payment of those claims met the test for critical vendor status. In addition, the UST analogized the drivers to prepetition employees, and pointed out that, because each of their claims is less than the amount allowed as a priority claim under § 507(a)(4), they would be among the first paid in any event.

Based on Mr. O'Neal's uncontroverted testimony, I find that the proposed payments to the drivers were negotiated at arms-length; that approval of their payment is critical to the future of the Debtor's business; that paying the drivers confers a

8

benefit on the estate and its creditors and not just the drivers themselves; that interested parties were represented and, indeed, the two objecting parties withdrew their objections; and that, by the end of the June 5 hearing, there was no strong disagreement from the creditor body. In addition, I found Mr. O'Neal's testimony that the drivers would walk away without payment of these claims to be credible and that that would result in immediate and irreparable harm to the Debtor.

Finally, I agree with the UST that, while the drivers' priority status may not be a factor on whether they qualify as "critical vendors," *per se*, that fact does significantly diminish the potential harm to other creditors by being paid on prepetition claims before a plan is confirmed.

As a result, and as previously ruled in the Interim Order, the Motion is GRANTED as to the Independent Drivers.

**The Contract Carriers**

The next category of critical vendors consists of three Contract Carriers with claims totaling $34,390: A.L. Smith Trucking, Inc.; Advance Transport, Inc.; and Heavy Duty Trux, LTD. According to Mr. O'Neal, these are small carriers to whom the Debtor brokers freight. They look to the Debtor for freight and advancements for fuel. In that way, their relationship to the Debtor is similar to the Debtor's relationship with Prime. Mr. O'Neal testified that they use the Contract Carriers when

a client needs a load hauled on a route where the Debtor does not have trucks available. He uses the Contract Carriers for clients such as Ben & Jerry's and Unilever. He testified that this is a consistently profitable part of the Debtor's business. The Contract Carriers are all small carriers who are heavily dependent on cash flow. If they are not paid very promptly, they would either go out of business or would have to walk away from the relationship with the Debtor and immediately find contract work with someone else. In addition, relationships with contract carriers such as these are built over time and, when one walks away and forms a relationship with another carrier, it is very difficult to get them back. That being the case, they are not, he said, easily replaceable.

In *In re Kmart*, the Seventh Circuit pointed out that most creditors will continue to work with a debtor on a cash basis, even if they are not paid on their prepetition claims and, in such cases, there is no need to pay the prepetition claims prematurely.[6] However, Mr. O'Neal testified that the Debtor has run out of cash. At the time of the June 5 hearing, the Debtor had not yet started the transition to Prime, and so the stream of cash from Prime would not fully kick in for several weeks. Nor had the Debtor yet entered into a postbankruptcy financing arrangement with Transportation Alliance Bank, with whom it had the prepetition factoring arrangement, or any other

---

[6] 359 F.3d at 873.

creditor. In other words, at that point, the Debtor was not able to pay its creditors, including the Contract Carriers, in cash going forward.

Based on that uncontroverted testimony, I find that the proposed payments to the Contract Carriers were negotiated at arms-length; that approval of their payment is critical to the future of the Debtor's business; that paying the Contract Carriers confers a benefit on the estate and its creditors and not just the Contract Carriers themselves; and that interested parties were represented in these proceedings. I also find that, because the Debtor is currently unable pay these creditors in cash, the Contract Carriers are likely to either fold themselves, or walk away, without immediate payment of the prepetition claims, and that the Debtor is unable to quickly replace them. In that event, the Debtor would be immediately and irreparably harmed.

As a result, and as previously ruled in the Interim Order, the Motion is GRANTED as to the Contract Carriers.

## The Vendors and Suppliers

The final category on the Critical Vendor List includes seven creditors consisting of fuel suppliers and maintenance providers for the Debtor's equipment. Those included Comdata Corporation, a Mastercard/ Fuel Purchase Contractor, with a claim of $277,897.90; Ozark Utility, with a claim for trailer repairs in the amount of $17,501.50; Pilot Corporation, with a claim for fuel in the amount of $142,662.13;

11

Speedco, Inc., with a claim for on-the-road truck maintenance in the amount of $3,270.03; Springfield Freightliner Sales, with a claim for maintenance of tractors in the amount of $220,000; Thermo-King of Springfield, LLC, with a claim for refrigeration unit and power unit repairs in the amount of $7,842.92; and Travel Centers of America with a claim for on-the-road truck maintenance in the amount of $39,943.53.

At the June 5 hearing, the Debtor withdrew the Motion as it related to Pilot Corporation and, therefore, I denied the Motion as to it. In addition, at the request of Springfield Freightliner Sales at the June 26 final hearing, I have reserved the Motion as it relates to Springfield Freightliner, pending determination of the Debtor's assumption of its contract with it.

As to Comdata, I granted the Motion in the Interim Order and authorized its payment. Comdata funds the Debtor's purchase of fuel. Obviously, the Debtor requires significant amounts of fuel every day, seven days a week. Although Prime will be responsible for paying for the fuel on the vehicles once they have been transitioned to it, the Debtor is still required to supply fuel for its vehicles during the transition period. In addition, the Debtor's plan is to keep a number of its trucks under its control for certain lucrative contracts, including a profitable cross-town shuttle with Kraft Foods, even after the transition to Prime is complete, and the Debtor will

continue to be responsible for fuel for those trucks. Prior to the bankruptcy filing, the Debtor was operating under a line of credit with Comdata. It paid Comdata weekly, so long as it did not exceed the line of credit. However, Comdata has terminated that arrangement, and now requires the Debtor to prepay for fuel on a daily basis. Cutting the Debtor off of fuel, for even a very short time, would have a catastrophic domino effect, in part because it would leave drivers out on the road unable to acquire fuel, and those drivers would then be reasonably expected to walk away from trucks carrying refrigerated freight. Mr. O'Neal testified that the relationship with Comdata was already in a fragile state such that the Debtor was on a day-to-day basis with it. Comdata could cut them off at any time.

Based on Mr. O'Neal's testimony, I find that the proposed payment to Comdata was negotiated at arms-length; that approval of that payment is critical to the future of the Debtor's business; that paying Comdata confers a benefit on the estate and its creditors and not just Comdata itself; and that interested parties were represented in these proceedings. I also find that, as with the Contract Carriers, because the Debtor is currently unable pay Comdata in cash, it will shut the Debtor off without immediate payment of its prepetition claim. Doing so would result in immediate and irreparable harm to the Debtor. And, as with the independent drivers, there seems to be no dispute that Comdata's claim is for fuel supplied in the few days before the filing. As

a result, any unpaid claim of Comdata would appear to have priority under § 503(b)(9).

Therefore, and as previously ruled in the Interim Order, the Motion is GRANTED as to Comdata.

As to the remaining vendors and suppliers, namely, Ozark Utility, Speedco, Inc., Thermo-King of Springfield, and Travel Centers of America (collectively, the "Interim Vendors"),[7] I authorized the Debtor to pay them based on the same terms as the Debtor's prepetition terms with each of them, with such payments being first applied to the § 503(b)(9) administrative claim portion of each Interim Vendor's claim, pending final Order. However, that authorization was expressly on an interim basis, subject to further hearing. In the Interim Order, I directed the Debtor to be prepared to present evidence at the final hearing on the following issues as they related to the Interim Vendors:

> (a) whether each Interim Vendor would refuse to continue to do business with the Debtor without immediate critical vendor payment;
>
> (b) whether the Debtor has no reasonable alternative to the services provided by each Interim Vendor;
>
> (c) whether each Interim Vendor will continue to do business on the same terms with the Debtor after receiving critical vendor payment; and

---

[7] As mentioned above, the Motion has been deferred as to Springfield Freightliner.

(d) what portion of each Interim Vendor's claim is entitled to administrative expense priority or reclamation.

The Debtor itself offered no evidence on these issues at June 26 hearing. Thermo-King of Springfield, which performs maintenance and service on the auxiliary refrigeration units for the Debtor's trailers, did present one witness to testify on its own behalf as a critical vendor. Based on that testimony, I find that Thermo-King has not shown that it would cease doing business with the Debtor if it were not paid as a critical vendor, particularly in light of the relatively small amount of its claim. The evidence as to Thermo-King of Springfield does not meet the high standard for critical vendor status.

In addition, Ozark Utility submitted documentation, including a transcript of the Rule 2004 Exam of its principal, Estel Brackett, in support of its status as critical vendor. Ozark Utility operates a maintenance center located adjacent to the Debtor's property and performs warranty work and Department of Transportation compliance work on the Debtor's equipment, essentially on-site. Although Ozark Utilities' counsel attempted to clarify or recharacterize the transcript testimony, Mr. Bracket did not testify that Ozark Utility would end its 12-year relationship with the Debtor if it was not paid as a critical vendor.

Finally, in contrast to the testimony concerning the approved critical vendors

15

above, Mr. O'Neal testified at the June 5 hearing that he could not speak to the issue of whether these creditors would cease business with the Debtor if they were not paid immediately. He simply said that these creditors are used to being paid timely. Indeed, he testified that one of them, Speedco, was placed on the Critical Vendor List at the request of the Debtor's maintenance group. The fact that these creditors are used to being paid timely, or that the maintenance group wanted them to be paid falls far short of meeting the standard for critical vendor status.

As a result, the Critical Vendors Motion is DENIED as to Interim Vendors Ozark Utility, Speedco, Inc., Thermo-King of Springfield, and Travel Centers of America.

The Debtor argues that the payments already made to the Interim Vendors under the Interim Order cannot be recovered. However, the Interim Order was expressly made subject to further hearing and consideration as to the Interim Vendors, with direction to the Debtor as to what it needed to show to get those approved. As stated, the Debtor failed to make that showing as to the Interim Vendors. While it remains to be seen at this point whether any of the payments are recoverable from the Interim Vendors, the *Kmart* Court implied that actions to recover such payments could be available under section 549 of the Code.[8]

---

[8] *In re Kmart*, 359 F.3d at 869-70.

I note, however, that since the *Kmart* decision, Congress amended the Code by adding § 503(b)(9), which gives administrative expense priority status to the value of any goods sold to a debtor within 20 days prior to its bankruptcy petition. Since any creditor with such priority is entitled to be paid in full, in cash, on the effective date of any confirmed Plan,[9] recovery of such funds could well have no practical effect. In any event, the evidence offered was imprecise as to the amount of such payments which would have been administrative expenses anyway. Unfortunately, too much of the financial information offered in the case to date has been similarly imprecise and unhelpful. In the event any adversary action is filed to recover any of the payments made under the Interim Order, the Court will then consider whether such payments are protected by such order and, if not, the effect of § 503(b)(9) on any recovery.

## Conclusion

For the foregoing reasons, the Motion for Authorization to Pay Prepetition Claims of Critical Vendors and Contractors is GRANTED as to the Transport Services (Independent Truck Drivers), the Contract Carriers, and Comdata Corporation. The Motion is DENIED as to Pilot Corporation and Interim Vendors Ozark Utility, Speedco, Inc., Thermo-King of Springfield, LLC, and Travel Centers of America.

---

[9] 11 U.S.C. § 1129(a)(9).

The Motion remains pending as to Springfield Freightliner Sales. To the extent relief is denied herein as to any vendor, payments made to such vendor pursuant to the Interim Order shall be credited first towards payment of any § 503(b)(9) portion of such vendor's claim.

    IT IS SO ORDERED.

                                          /s/ Arthur B. Federman
                                              Bankruptcy Judge

Date: 6/29/2012

Attorney for debtor to serve parties not receiving electronic notice